UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**EUNICE A. BRIGGS** and **TONI A. BRIGGS**,
as Co-Administratrixes of the Estate of Richard E. Briggs,

Plaintiff,

v.

**THE TOWN OF OGDEN, THE OGDEN POLICE
DEPARTMENT, CHIEF DOUGLAS NORDQUIST,
SERGEANT SHAWN FITZGERALD, SERGEANT
CHRISTOPHER MEARS, OFFICER STEVEN PLOOF,
THE COUNTY OF MONROE, THE MONROE COUNTY
SHERIFF'S OFFICE, SHERIFF PATRICK O'FLYNN,
SERGEANT THOMAS BURNS, DEPUTY MICHAEL
SHANNON, DEPUTY MATTHEW MACKENZIE,**
in their individual and official capacities, and other known
or unknown members of THE OGDEN POLICE DEPARTMENT
and THE MONROE COUNTY SHERIFF'S OFFICE,

Defendants.

**AMENDED
COMPLAINT**
Civ. No.: 09CV6147 CJS

_____

Plaintiffs Eunice A. Briggs and Toni A. Briggs, by and through their attorney,

Jeffrey Wicks, PLLC, for their Complaint against the defendants, allege as follows:

**PARTIES**

1.      At all times herein alleged, Plaintiff EUNICE A. BRIGGS ("Eunice") resides

at 2684 Chili Avenue, City of Rochester, County of Monroe, State of New York.  Plaintiff

TONI A. BRIGGS ("Toni") resides at Windsorshire Drive, Rochester, New York.  Eunice

and Toni bring this action as the mother and spouse, respectively, of the late Richard E.

Briggs ("Rich" or "decedent Briggs"), and as co-adminstratrixes of the estate of Richard

E. Briggs, d/o/d March 30, 2008.

2.      Upon information and belief, at all times herein alleged, defendant, the

Town of Ogden was and is a municipal corporation duly organized and existing under the law of the State of New York with offices at 269 Ogden Center Road, Spencerport, New York 14559.

3.      Upon information and belief, at all times herein alleged, defendant, the Ogden Police Department ("OPD"), was and is a police department and has duly appointed police officers, pursuant to New York law and mandate of the Town of Ogden with offices located at 269 Ogden Center Road, Spencerport, New York 14559.

4.      Upon information and belief, at all times herein alleged, defendant, Ogden Police Chief Douglas Nordquist ("Nordquist"), was and still is a duly appointed police chief employed by defendant, Town of Ogden and Ogden Police Department.

5.      Upon information and belief, at all times herein alleged, defendant, Sergeant Shawn Fitzgerald ("Fitzgerald"), was and still is a duly police officer employed by defendant Ogden Police Department.

6.      Upon information and belief, at all times herein alleged, defendant, Sergeant Christopher Mears ("Mears"), was and still is a duly police officer employed by defendant Ogden Police Department.

7.      Upon information and belief, at all times herein alleged, defendant, Officer Steven Ploof ("Ploof"), was and still is a duly appointed police officer employed by defendant Ogden Police Department.

8.      Upon information and belief, at all times herein alleged, defendant, The County of Monroe (the "County" or "Monroe County"), was and is a municipal corporation duly organized and existing under the laws of the State of New York, and located in the State of New York with offices at 39 West Main Street, Rochester, New

York 14614.

9.      Upon information and belief, at all times herein alleged, the defendant, the Monroe County Sheriff's Office ("MCSO"), has and still does maintain a Sheriff's Department and the defendant MCSO has duly appointed police officers, pursuant to New York law and mandate of the County of Monroe with offices located at 130 Plymouth Avenue South, Rochester, New York 14614.

10.      Upon information and belief, at all times herein alleged, defendant, Monroe County Sheriff Patrick O'Flynn ("O'Flynn"), was and still is a duly elected sheriff employed by defendants, Monroe County and Monroe County Sheriff's Office.

11.      Upon information and belief, at all times herein alleged, defendant, Sergeant Thomas Burns ("Burns"), was and still is a duly appointed sergeant employed by defendants, Monroe County and Monroe County Sheriff's Office.

12.      Upon information and belief, at all times herein alleged, defendant, Deputy Michael Shannon ("Shannon"), was and still is a duly appointed deputy employed by defendants, Monroe County and Monroe County Sheriff's Office.

13.      Upon information and belief, at all times herein alleged, defendant, Deputy Matthew Mackenzie ("Mackenzie"), was and still is a duly appointed deputy employed by defendants, Monroe County and Monroe County Sheriff's Office.

## JURISDICTION AND PROCEDURAL REQUIREMENTS

14.      This action is brought forth pursuant to 42 U.S.C. Section 1983 and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, EPTL 5-4.1, the Constitution of New York State and common law.  Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(4) and 1391(b) and (c), and the aforementioned

statutory and constitutional provisions and pendent jurisdiction over the state law claims.

15.     All causes of action herein have been commenced within the applicable limitation period governing negligence actions and 28 U.S.C. Section 1983 actions as set forth in CPLR Section 214.

16.     A written Notice of Claim, sworn to by Plaintiff, was duly served upon Defendants the Town of Ogden and Odgen Police Department, on or about June 30, 2008, within 90 days after Plaintiff's claims arose, pursuant to General Municipal Law § 50-e.

17.     Defendants the Town of Ogden and Ogden Police Department have disclaimed liability and have refused to make any adjustment or payment; at least 90 days have elapsed since the Notice of Claim was presented to said Defendants for adjustment, and Defendants have neglected and refused to make any adjustment or payment.

## FACTS

18.     Decedent Richard E. Briggs was born March 23, 1970. He was clinically diagnosed as manic depressive/ bi-polar between 2003 and 2005. Rich was given to extreme panic attacks and mood changes, especially when he was threatened, ridiculed or otherwise offended. As a result of the panic attacks and diagnosis of bi-polar disorder, he subsequently was prescribed various medications to alleviate the symptoms of his mental condition.

19.     For the past several years, decedent Briggs was continuously treated by Dr. John R. Buckley for his condition, but he continued to suffer periodic panic attacks.

These panic attacks were usually allayed by a combination of Eunice's and other family members' consolation and reassurance, medication, and numerous trips to the hospital. Derivative

20.　　On the evening of March 30, 2008, Toni, decedent Briggs' spouse, and Rich became engaged in a marital argument within their apartment at 122-L Windsorshire Drive, Rochester, New York. During the course of the argument, decedent Briggs began pacing and became very manic, due to his bi-polar disorder; a panic attack ensued.

21.　　During the course of his mania, decedent Briggs grabbed his gun and intimated to Toni that he would kill himself. He appeared agitated and scared as he frantically sought bullets for his guns, but Toni refused to reveal where they were. Scared by her husband's behavior, Toni called "911" at approximately 6:40 p.m. Toni told the 911 operator that decedent Briggs was threatening to kill himself and to send help immediately.

22.　　Shortly thereafter, OPD officers were dispatched to the Briggs' Windsorshire address "for a suicidal man with a gun". Sergeant Shawn Fitzgerald ("Fitzgerald") reported his arrival at the complex at 6:44 p.m. Sgt. Fitzgerald was joined there by Officer Steven Ploof of the OPD, and Sgt. Thomas Burns and Deputy Matthew Mackenzie of the MCSO.

23.　　Brian Austin and decedent's sister Donna Austin ("Donna") also heard the dispatch while listening to a police scanner. After confirming Rich and Toni's address with decedent's sister Joan Burnett ("Joan"), Brian and Donna telephoned other members of decedent Briggs' family to alert them to what was transpiring and to get

their help.

24.     At 6:59 p.m. Eunice received a phone call from decedent Briggs during which he told her briefly what had happened, said goodbye and hung up. It was at roughly 7 p.m. that Joan telephoned decedent Briggs' parents. Richard W. Briggs ("Mr. Briggs") was told that he and his wife Eunice needed to go immediately to decedent Briggs' residence because he was in some kind of trouble.

25.     At or about 7:10 p.m. Eunice spoke to Rich again and told him that she would come over immediately to see him. Mr. Briggs and Eunice then rushed out of their home and drove to the Windsorshire address.

26.     Inside the marital apartment, decedent Briggs continued to behave erratically and at some point placed the barrel of the gun toward his neck, at which point Toni lunged at him to get the gun out of his hands. He pushed her down, out of his way, and told her to "[g]et out of here. You don't want to see this." Toni pleaded with decedent Briggs to calm down and told him "it doesn't have to end like this", but her pleas were unavailing.

27.     Wondering what was taking the police so long, Toni looked out of a window and went out on the balcony to see if the police were coming. She observed several OPD officers walking around in the parking lot at the wrong address. She called to them and waved them over. When Toni reentered the home decedent Briggs told Toni that he believed the cops would come in shooting at him. He further stated: "This is it for both of us anyway because you called the cops and they're coming and I'm going to shoot at them if they come in here shooting at me."

28.     Toni then left the apartment to meet the OPD officers downstairs at the

entrance of the apartment. Decedent Briggs immediately locked and bolted the apartment door behind her. When Toni reached the downstairs entrance, she opened the door and told the approaching officers: "You have to help [Rich], he's suicidal and he's mentally ill, and he has bi-polar disorder; you have to get him some help." Toni told also told the police that decedent Briggs had been snorting oxycontin, a narcotic pain reliever.

29. Toni further explained to the officers that decedent Briggs was extremely scared and that he thought the OPD were going to come in shooting at him. Toni warned the police that decedent Briggs had also stated that if the police came in shooting, he would shoot back.

30. Upon receiving this information, the OPD officers drew their weapons and began evacuating the building of its other occupants. Toni asked the officers what they were going to do and pleadingly inquired, "Isn't anyone going to go and try and help my husband?" An OPD officer responded to her and said, "Everything is going to be O.K., we can't just walk in there because he has high powered weapons in there and we are not protected."

31. Meanwhile, decedent Briggs' four sisters and other relations began arriving at the Windsorshire apartment complex. Joan and Eunice E. Briggs, both sisters of the decedent, were the first to arrive, but were met by police who had sealed off the perimeter of the apartment building Toni and decedent Briggs occupied. After a brief conversation, wherein Joan provided the officer with information about her brother, police ushered Joan and Eunice E. Briggs to a vacant apartment (later opened by the rental manager Kathy Reese) and were instructed not to leave by the uniformed

7

officers.

32.     Inside the 122 Windsorshire apartment building, Toni continued pleading with responding OPD officers saying, "He's not going to shoot you unless you burst in there and scare him and start shooting at him." She asked the police if they would at least attempt to speak with him. They affirmatively responded that they would and that they would do everything to ensure a safe outcome. However, they never attempted to knock on the door, call decedent Briggs, or even use the intercom system at the outside entrance of the building.

33.     During that time, decedent Briggs' parents arrived and were taken to the location of a vacant apartment in the complex, along with other members of the Briggs family.

34.     Despite Toni's statement that she did not want to leave her husband, the police removed her from the building and escorted her to a police car situated on adjacent Statt Road. Toni was taken first to the entrance of the apartment complex and then to a vacant apartment within the complex, where decedent's arriving family had been sequestered.

35.     Lorraine Briggs ("Lori") spoke with a frantic Rich over the telephone at around 6:45 p.m. and told him she would be coming to see him. She arrived at the Windsorshire apartments shortly thereafter and was directed to the vacant apartment by the police. As she approached the apartment, she witnessed her father, Richard W. Briggs, smoking a cigarette outside and speaking with MCSO and other police officers. Mr. Briggs asked the police if he could go talk to his son, explaining that Rich usually calmed down if he spoke to family. Mr. Briggs explained to the police that Rich was not

a killer and that the notion that Rich wanted to shoot police was mistaken. Regardless, the police told Mr. Briggs he could not get near the apartment for his own safety. Mr. Briggs told them he would sign a waiver of indemnity and subsequently asked the same officers what they would do if he ran up to the apartment to speak with his son in spite of their instructions. The officers responded, "We would have to stop you." Mr. Briggs, decedent's father, heeded the officers' instructions, remained at the apartment, and did not attempt to contact his son.

36.     Toni arrived at the vacant apartment sometime after 7:30 p.m. and was welcomed by the Briggs family. At around 7:52 p.m. Lori received a phone call from decedent Briggs on her cellular phone. Rich wanted to know why none of his family was there with him. Lori explained that the police would not allow it. Lori began to ask Toni if she would speak to Rich, but a police officer immediately interjected and told her absolutely not. Toni heeded the officer and did not speak with her husband. The officer told Lori she should not be speaking with him either.

37.     Decedent Briggs explained to Lori that he was very scared and was having a serious panic attack. He needed to know where his prescribed Klonopin (clonazepam) medication was placed. Lori openly conveyed this information to Toni in front of the police officers. Toni told her where the medication was and Lori told decedent Briggs.

38.     Once taken, Klonopin has a sedative effect, which would have caused decedent Briggs to become first calm and then drowsy. Upon information and belief, Rich consumed the Klonopin medication over the course of the evening and experienced these effects.

39.	Lori continued to tell Rich he was not in trouble and that he should just come outside, but Rich did not believe her because of the police presence. Lori was asked by another police officer if she was speaking to Rich. She confirmed that she was and **again** the police told her to refrain from speaking to him. Lori essentially complied and told the officer that the OPD should be speaking with her brother, and attempted to hand her cellular phone to the officer with Rich still on the line. Lori told the officer to reassure decedent Briggs that he could come out and everything would be alright. The officer refused, stating, "I'm only here to secure the perimeter. I can't talk to him. You shouldn't even be talking to him."

40.	Following that statement, the police corralled each member of the Briggs family inside the vacant apartment, telling them that they needed to be out of the line of view from Rich's apartment. Despite the family's repeated assurances that Rich would never hurt any of them, the family was kept secluded and out of sight from him.

41.	Inside the vacant apartment, a police officer began gathering information from the Briggs family. Toni provided her name, phone number, and important information, such as Rich's physician's phone number. Also arriving at the apartment was a police hostage negotiator ("negotiator"), who introduced himself and told the family he was in charge. When asked by the Briggs family how serious the situation was and what the outcome would be, the negotiator responded that, "This is nothing. I have seen a lot worse. Your brother will be out of there in no time." The negotiator gave further assurances to Eunice and the others not to worry and that the situation would come out well.

42.	Joan and Lori asked why a hostage negotiator was necessary, asking,

"Who's the hostage? The cat?" The negotiator replied that decedent Briggs' wife was the hostage. Incredulous, Joan and Lori responded, "His wife is sitting right behind you", and pointed out Toni, who was seated in the room.

43.     After the various family members answered each of the negotiator's questions about Rich and his condition, Eunice Briggs (decedent's mother), told the negotiator that Rich had just spoke with her. Rich wanted Eunice to come over to speak in person and Eunice had promised to do so. However, the police would not allow her to talk to Rich further or to visit him.

44.     In fact, the negotiator and other police personnel continued to warn the family not to call Rich, not to pick up his phone calls, and if he did call, to hang up the phone after telling him the police would contact him. The negotiator went on to say that if the family refused to obey, then the police would be required to cut the phone lines. Joan pleaded with them not to do so because it would be in everyone's interest to keep decedent Briggs talking, to keep him safe. The family expressed their fear to the police that if the lines were cut decedent Briggs would panic. Despite their fears, however, Eunice and Richard (decedent's parents), as well as Toni (decedent's spouse), justifiably relied on the promises of the police to contact Rich and alleviate the situation. Heeding the instructions of police, none of them attempted to contact Rich independently throughout the **over** four (4) hour ordeal.

45.     At approximately 8:30 p.m. Cheryl McKeever, decedent Briggs' sister, and her husband arrived at the Windsorshire apartment complex and were directed to the vacant apartment.

46.     At approximately 8:33 p.m. Rich made a phone call to Alan Lafler ("Alan"),

a long-time friend residing in South Carolina. Rich had called Alan several times during the course of the day. Rich never expressed a desire to shoot police or himself during the conversations. Rich was calm during the conversations, but expressed worry about work the next day and worried he might lose his job. Rich told Alan he was waiting for the police to call and wondered why they had not tried to reach him yet, despite their promises to do so.

47.     At approximately 8:42 p.m. Lori again received a call from her brother Rich. Rich expressed that he was afraid of going to jail and wanted to be reassured he was not in a lot of trouble. As directed by the police, Lori told Rich that the police promised to call him. Decedent Briggs wished to speak to the police immediately. Lori implored the hostage negotiator in the room to speak with him and tell Rich he could safely come out. **The negotiator refused**, saying he was not ready to speak to Rich yet. He again told her not to speak with Rich. Lori tried to reassure Rich that everything was alright and that he was not in that much trouble. Decedent Briggs did not believe her, asking her then, "Why haven't the cops tried calling me?" Lori urged him to come out of the apartment, but he again expressed his belief that the police would shoot him, so he refused. Lori told decedent Briggs that if he left the gun on the couch and came out everything would be fine. Still in disbelief, decedent Briggs asked Lori, "Well, why won't they tell me that?" Despite his espoused fear that the police would shoot him, Lori believed that Rich sounded calm and even sleepy and conveyed this information to her siblings and the police; he was ready to surrender. The phone call was then suddenly disconnected.

48.     Upon information and belief, the OPD and MCSO cut decedent Briggs'

telephone line, thwarting any further communication with the outside world, and causing Rich to experience extreme trepidation. Without the telephone, Rich was completely isolated and susceptible to another panic attack.

49.     Surmising that Rich had taken his Klonopin, Lori and Joan told the negotiator that decedent Briggs was likely sleeping and/or heavily sedated in response to the medication. They urged the negotiator to contact him or go into the apartment now, as Rich was likely asleep. The negotiator ignored the women and told them to stop talking to decedent Briggs, and further stated that the police would take care of the negotiation, and instructed them to hang up the phone if he called again.

50.     Sometime after speaking with the negotiator and sitting in the vacant apartment, Toni was escorted by the hostage negotiator from the vacant apartment to the Italian-American Community Center ("the Center"), across the street from the Windsorshire apartments, purportedly to speak with Rich. Eunice followed behind Toni and the negotiator at the family's insistence, but never spoke to Rich and was simply returned to the vacant apartment some time later. Toni was questioned by an unknown male and female, assumed by Toni to be police, and then was directed to give a separate statement to Sgt. Christopher Mears ("Mears").

51.     At roughly 9 p.m., while Toni sat in Mears' police car, she described the earlier events of the day which precipitated the current ongoing situation. As she did so, Toni saw a tactical SWAT unit arrive in an armored vehicle, and SWAT members emerge from the vehicle. Mears transcribed the deposition, and Toni read, corrected and signed it. Becoming increasingly visibly distraught over the SWAT team and the scene unfolding around her, Toni asked, "Is this all for Rich?" Toni thought it looked like

a war movie. Mears stated: "You don't need to see this," and summarily drove them out of eyesight of the aggressive police response.

52.      Mears then returned Toni to the Center, where she sat alone with various policemen periodically checking on her. Each time an officer entered she was told "not to worry", because they "had everything under control", and promised that "this will all be okay" and would be "over soon." At some point, Monroe County Sheriff Patrick O'Flynn visited Toni himself and assured her that Rich was "okay" and said, "We are doing everything we can to try and help Rich. Things will be over soon and everything will be okay."

53.      After returning Toni to the Center, Mears took the statement to the OPD and completed an information and a warrant form, *despite the fact* that **at least two** exceptions to the warrant requirement were present: **(1) Toni, an inhabitant of the apartment, had consented to police entry; and (2) exigent circumstances clearly existed**. Mears, however, took the paperwork and drove to the residence of Judge David A. Murante, where the judge signed the warrant. Upon information and belief, Mears' actions in obtaining a warrant consumed *more than* an hour and a half. Such efforts were a complete waste of time, were unnecessary, and futilely consumed significant additional time during which no attempts to contact Rich were made by law enforcement.

54.      Sgt. Fitzgerald reported that he, Sgt. Burns, Off. Ploof, and Deputy Mackenzie were relieved by SWAT team members at 9:15 p.m.

55.      Over the course of the evening, the only meaningful information provided to the Briggs family was derived from Brian Austin, who continued to listen to the police

scanner at home and convey what he heard to his wife Donna. The police had only offered continued assurances that the situation was under control, that they were going to be talking to Rich, and that everything would be alright. However, at some time after 10 p.m. the deputies realized that the family was listening to the scanner and switched channels. At that point, the family was completely cut off from the "rescue" efforts, but continued to ask the police to allow Eunice to speak with her son.

56.     According to police reports, at approximately 11 p.m., having made no previous attempts to communicate with decedent Briggs, the SWAT team utilized a megaphone, and forebodingly stated something to the effect of: "RICHARD E. BRIGGS, THERE IS A PHONE ON YOUR BALCONY, GO OUT ONTO THE BALCONY AND PICK UP THE PHONE." The command was repeated. SWAT next yelled: "IF YOU CAN HEAR US, TURN YOUR LIGHTS ON AND OFF".

57.     Upon information and belief, decedent Briggs did not walk out onto the balcony because of his repeatedly espoused belief that the police intended to shoot him—a fact that the police were repeatedly made aware of, and a fact with which the police never took it upon themselves to dispel.

58.     Within moments of the megaphone statements, SWAT, without warning, explosively deployed, upon information and belief, three to four canisters of tear gas into Rich and Toni's apartment. The sound of the tear gas deployment resonated like explosives. The Briggs family also heard two unique noises, recognized as gunshots, in addition to more tear gas explosions.

59.     At 11:16 p.m. SWAT members reported finding Rich deceased in the apartment. He was allegedly positioned on the living room couch with a shotgun on the

floor in front of him; SWAT made a preliminary determination that his cause of death was a self-inflicted gunshot wound.

60.     Sgt. Fitzgerald and Sgt. Mears notified Toni of Rich's death at the Center and other uniformed officers informed the rest of the Briggs family in the vacant apartment. An escort returned Toni to the Briggs' family, where she waited the arrival of her sister.

61.     Throughout the evening, from the beginning of the ordeal until the very end, the Briggs family, individually and collectively, pleaded ad nauseum with the police and other present authorities to allow decedent Briggs' mother Eunice to speak with her son. Eunice had always been successful in dealing with her son when he experienced similar episodes and was always able to "talk him down". Allowing Eunice to speak with Rich would undoubtedly have led to a different resolution, however, the police flatly refused to allow it.

62.     Upon information and belief, the OPD, MCSO, and SWAT failed to follow established protocol and procedural guidelines when confronting a situation where an individual threatens suicide; police actions fell far below even minimally acceptable police procedures and evinced grossly deficient suicide prevention training.

63.     Over the entire course of the ordeal, from the "911" call at 6:40 p.m. until SWAT unexpectedly dispensed tear gas throughout the apartment and subsequently discovered Rich dead at reportedly 11:15 p.m., the OPD and MCSO made no effort to communicate, negotiate, or talk to decedent Briggs in an effort either to bring him out of his apartment or to dissuade him from harming himself.

64.     Rather than make efforts to expeditiously secure communication with

Rich, as Toni, Eunice, Lori, Richard, and the rest of the Briggs family had pleaded for them to do and which they in turn promised to accomplish, OPD instead squandered valuable time collecting statements, returning to their office, swearing out a warrant application, driving out to a judge's residence to secure the warrant, and driving back to the scene of the incident. As a result of OPD's negligent conduct, in seeking out a warrant where such a course of action was clearly obviated by consent and exigent circumstances, Rich killed himself.

65.     The OPD, MCSO, and SWAT were acutely aware of decedent Briggs' fragile mind state. They were acutely aware of decedent Briggs' fear that the police intended to invade the apartment and shoot him. They were acutely aware that decedent Briggs' had said he would shoot himself before letting the police shoot him. And yet, despite specific knowledge of these facts, the police, in conjunction with SWAT, initiated a "plan" which not only emboldened and struck to the heart of Rich's anxieties, but failed in the most basic and sensible of approaches—speaking to Rich and calming him, assuaging his fears. Instead, the defendants brought to life Rich's espoused fears with explosions and yelling, causing him to live up to his threats and kill himself, rather than be killed.

66.     As a result of the defendants' actions, Rich is dead, and Toni, Eunice, and his family have suffered extreme emotional distress, the anguish and torment of grieving for and burying a beloved son, husband, and brother; they have suffered a loss of consortium, loss of future support, and voluntary assistance, loss of services in the home, and they have incurred funeral expenses and attorney's costs.

67.     Eunice A. Briggs and Toni A. Briggs affirm Rich's and the family's rights

pursuant to 42 U.S.C. Section 1983 have been violated by the actions of the OPD, MCSO, and SWAT, as well as those individually named and those responsible not named.

## AS AND FOR A FIRST CAUSE OF ACTION
## WRONGFUL DEATH

68.     Eunice A. Briggs amd Toni A. Briggs repeat and reallege paragraphs 1-67 as if fully set forth herein.

69.     Rich was born alive March 23, 1970 and died on March 30, 2008.

70.     Rich's death was caused by the wrongful acts and omissions of defendants, namely, defendants' failure to communicate with decedent despite their repeated promises to do so, defendants' restrictions on decedent's family members during the course of the ordeal (preventing the Briggs' from speaking with Rich telephonically and speaking with him in person), **defendants' negligence in procuring an unnecessary and superfluous warrant which wasted valuable time**, and defendants' negligently cutting off Rich's phone lines, deploying explosive tear gas, and raiding Rich's apartment with SWAT, despite specific knowledge that such actions would trigger Rich to have a panic attack and kill himself.

71.     Rich has numerous family members surviving him, specifically, his wife, his parents, and five sisters, each statutory distributees, who have sustained significant pecuniary loss by reason of decedent's death, including but not limited to: loss of loss of support, services and future wages, and funeral expenses.

72.     Eunice A. Briggs and Toni A. Briggs were appointed the personal representatives of Rich's estate and commenced this suit.

## AS AND FOR A SECOND CAUSE OF ACTION
## NEGLIGENCE

73.      Eunice A. Briggs and Toni A. Briggs restate and reallege paragraphs 1-72 as if fully set forth herein.

74.      Defendants assumed an affirmative duty to decedent Briggs and his family, to act as an ordinary and prudent person in the circumstances, to help prevent decedent from committing suicide.  Defendants repeatedly promised decedent Briggs and his family members that they would call Rich and negotiate a peaceful resolution of the situation.  Defendants made repeated assurances to the Briggs family and decedent Briggs, by and through his family, that the situation would have a successful outcome and that defendants would do everything possible to ensure a safe outcome.

75.      Defendants were keenly aware that inaction could lead to harm.  In fact, defendants had specific knowledge that open communication, especially with family, had a mollifying effect on Rich's panic attacks, but chose instead not to communicate with him.  Defendants also specifically knew that Rich feared the police were going to lay siege to the apartment and shoot him.  Defendants also knew that Rich had said that if the police barged in, he would shoot himself.  But rather than assuage these fears, the police failed to properly communicate with Rich in a non-confrontational manner.  The police instead used a megaphone and SWAT tactics to finally contact him **over four** (4) hours after the situation had arisen.

76.      Both Rich and the Briggs family justifiably relied on the police's promise to call Rich and negotiate a peaceful resolution of the situation, to their irrevocable detriment.  Rich repeatedly asked friends and family why the police had not contacted him yet, as they had promised.  Rich grew increasingly anxious as the time passed.

Eunice, Toni, and Richard W. Briggs, and decedent's sisters and family relied on the police's claimed expertise and their instructions and did not attempt to visit the apartment or contact Rich.

77.     Defendants breached their affirmative duty by failing to call Rich once throughout the nearly four hour "stand-off", by failing to involve his mother Eunice in the surrender discussions, by swearing out a superfluous warrant application which wasted crucial hours of time, and by putting into effect an aggressive, confrontational resolution of the matter, deploying tear gas and a SWAT team with live ammunition into the apartment—all after promising to help Rich, speak to him, and effect a peaceful outcome.

78.     Defendants' actions were the direct and proximate cause of Rich's death. The defendants acted in such a way as to increase the likelihood that Rich would take his own life, rather than taking steps to minimize the risk of suicide. Rich's suicide was not only reasonably foreseeable, but the defendants had actual knowledge that Rich had threatened to take his own life, and specifically that Rich feared the police would shoot him. In addition to that, defendants had actual knowledge that Rich had threatened to shoot himself if the police invaded the apartment. And yet defendants did exactly that, directing Rich onto the porch with a megaphone (where he feared being shot) and then raining exploding tear gas into the apartment without warning and invading the apartment. Defendants were deliberately or recklessly indifferent to the suicide threat and their actions caused Rich to suffer a severe panic attack and kill himself.

79.     As a result of defendants' actions, Rich suffered irrevocable damages,

conscious pain and suffering before death, and ultimately wrongful death. Rich's family has borne emotional trauma and distress and pecuniary damages.

## AS AND FOR A THIRD CAUSE OF ACTION
## LOSS OF CONSORTIUM

80.     Toni A. Briggs restates and realleges paragraphs 1-79 as if fully set forth herein.

81.     At all times relevant to this Complaint, Toni A. Briggs was and continues to be a resident of the State of New York and was lawfully married to and residing with the decedent Richard E. Briggs.

82.     By reason of Richard E. Brigg's death, which was the direct and proximate result of defendants' negligent actions, Toni A. Briggs has been deprived of the services, future wages, and consortium of decedent Briggs, including but not limited to companionship, society, affection, support and solace, the deprivation of sexual relations and the attendant loss of child-bearing opportunity. Toni has also been caused to suffer a loss of enjoyment of life, all of which caused said plaintiff spouse to be damaged and entitled to judgment against each defendant. Toni's damages are permanent and ongoing in nature.

83.     By reason of the foregoing, Toni A. Briggs incurred and was damaged due to funeral and other expenses associated with the decedent spouse complained of herein.

## AS AND FOR A FOURTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

84.     Eunice A. Briggs and Toni A. Briggs restate and reallege paragraphs 1-83 as if fully set forth herein.

21

85. Defendants engaged in conduct that was extreme and outrageous, and beyond all bounds of decency, by knowingly and deliberately deploying exploding tear gas into decedent's apartment without warning and without having first communicated with decedent, despite their actual knowledge that decedent had espoused fears that the police would raid his apartment and shoot him and actual knowledge that he would sooner kill himself than let the police shoot him.

86. Furthermore, the defendants knowingly and deliberately abated all efforts by decedent Briggs' family to contact Rich, comfort him, and otherwise attempt to secure his safe surrender to the authorities, despite defendants' actual knowledge that decedent wished to see his family and his family's historical success in alleviating his panic attacks.

87. Rich and the Briggs family present at the scene suffered extreme emotional distress as a direct result of all of the foregoing. Rich's emotional distress was so acute that he killed himself as a result of defendants' actions.

88. As a direct and proximate result of the acts by defendants described above, Rich and the Briggs family present at the scene of the ordeal suffered severe emotional distress, trauma, nervousness, anxiety, embarrassment and humiliation, and injury to their good name and reputation in the community and have incurred legal fees.

89. That by reason of the aforementioned, Eunice A. Briggs and Toni A. Briggs are entitled to and hereby make claim for full recovery of damages, including reasonable attorney's fees incurred as a result thereof pursuant to 42 U.S.C. Section 1988.

## AS AND FOR A FIFTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

90.     Eunice A. Briggs and Toni A. Briggs restate and reallege paragraphs 1-89 as if fully set forth herein.

91.     Defendants' negligent conduct and course of action was the proximate cause of Rich's extreme emotional distress.

92.     Defendants' negligent conduct and course of action caused Rich to fear for his physical safety.  Rich was in the zone of physical danger created by the defendants' and in reaction to defendants' negligent actions, Rich manifested his distress by killing himself.

93.     Defendants ostensibly ignored Rich's fragile state of mind, his condition and his history.  Defendants had actual knowledge that Rich feared a police intrusion, that he feared the police wanted to shoot him, and that he professed that he would kill himself before the police could shoot him.  Despite this knowledge, defendants pursued that precise course of conduct—an aggressive, non-communicative capture of decedent.  By using a megaphone to direct decedent move onto the porch and then, without warning, deploying exploding tear gas into the apartment, the defendants caused a dangerous confluence of events which created a reasonable and overwhelming fear in Rich for his physical safety.  The explosions and gunshots also created an overwhelming fear in the rest of the Briggs family present for their safety.  All of the foregoing conduct by defendants created an unreasonable risk of causing Rich and his family's emotional distress.

94.     Defendants possessed knowledge of all relevant information regarding Rich's bi-polar disorder, the proper treatment and approach to the same, and the wishes

of both decedent and the Briggs family to play a part in the negotiated surrender, and ultimately ignored all of the aforementioned, altogether ignoring the dangers imposed by such conduct. In addition, rather than establish communication with Rich and assuage his fears, defendants spent invaluable time swearing out and obtaining a superfluous warrant application which wasted crucial hours. Defendants conduct also created an unreasonable risk of causing Rich and his family's emotional distress.

95. As a result of all of the foregoing conduct by defendants, it was very much foreseeable that Rich would fear for his life and well-being. And with such stress weighing on his mind, it was foreseeable that Rich and his family would experience emotional distress.

96. Rich, Eunice A. Briggs, Richard W. Briggs , and Rich's sisters suffered emotional distress as a result of all of the foregoing.

97. Defendants' aforesaid conduct was the cause of Rich's, Eunice A. Briggs', Richard W. Briggs', and Rich's sisters' emotional distress.

98. That by reason of the aforementioned, Eunice A. Briggs and Toni A. Briggs are entitled to and hereby make claim for full recovery of damages, including reasonable attorney's fees incurred as a result thereof pursuant to 42 U.S.C. Section 1988.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

99. Toni A. Briggs restates and realleges each and every allegation contained in paragraphs 1-98 as if fully set forth herein.

100. Defendants' negligent conduct and course of action was the proximate cause of Toni's emotional distress.

101.    Defendants' negligent conduct and course of action caused Toni to fear for her physical safety.

102.    Defendants ostensibly ignored Rich's fragile state of mind, his condition and his history.  Defendants had actual knowledge that Rich feared a police intrusion, that he feared the police wanted to shoot him, and that he professed that he would kill himself before the police could shoot him.  Despite this knowledge, defendants pursued that precise course of conduct—an aggressive, non-communicative capture of decedent.

103.    The defendants stormed into the Briggs' Windsorshire apartment building brandishing weapons, ignored Toni's pleas to simply talk to her husband, and held her inside the apartment building for several tense minutes before removing her. Defendants later used a megaphone to direct Toni's decedent spouse onto their shared porch and then, without warning, deployed exploding tear gas into the apartment; the defendants caused a dangerous confluence of events which created a reasonable and overwhelming fear in Toni for her physical safety.  The explosions and gunshots also created an overwhelming fear in Toni for her safety.  All of the foregoing conduct by defendants created an unreasonable risk of causing Toni's emotional distress.

104.    In the wake of defendants' negligent conduct, and as a direct result thereof, Toni experienced physical manifestations of her stress, including observable shock, inability to speak, trembling, involuntary convulsions and tears.  She has been subsequently gripped by paranoia.

105.    Defendants possessed knowledge of all relevant information regarding Rich's bi-polar disorder, the proper treatment and approach to the same, and the wishes

of both decedent and the Briggs family to play a part in the negotiated surrender, and ultimately ignored all of the aforementioned, altogether ignoring the dangers imposed by such conduct. In addition, rather than establish communication with Rich and assuage his fears, defendants spent invaluable time swearing out and obtaining a superfluous warrant application which wasted crucial hours. Defendants conduct also created an unreasonable risk of causing Rich and his family's emotional distress.

106. As a result of all of the foregoing conduct by defendants, it was very much foreseeable that Toni would fear for her life and well-being, as well as for her husband's. With defendants acting as the only intermediary between Toni and her distraught and potentially suicidal spouse, it was foreseeable that she would experience emotional distress.

107. Toni suffered extreme emotional distress as a result of all of the foregoing.

108. Defendants' aforesaid conduct was the cause of Toni's emotional distress.

109. That by reason of the aforementioned, Toni A. Briggs is entitled to and hereby makes claim for full recovery of damages, including reasonable attorney's fees incurred as a result thereof pursuant to 42 U.S.C. Section 1988.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## NEGLIGENT TRAINING, RETENTION, AND SUPERVISION

110. Eunice A. Briggs and Toni A. Briggs restate and reallege each and every allegation contained in paragraphs 1 - 109 as if fully set forth herein.

111. Defendants are liable for emotional distress and other injuries suffered by Rich and his family as a result of their negligent hiring, training, supervision and retention of police officers in the OPD, MCSO, and SWAT.

112. Defendants knowingly employed, and retained in their employ, law

enforcement officers with known dangerous propensities in positions that presented a foreseeable risk of harm to decedent Briggs and others.

113.    Plaintiff asserts that the employers of the individual members of the MCSO, OPD, and SWAT knew, or should have known, of their inability to properly handle hostage negotiation/suicide threats; and of their ability to discern when and where warrant applications are required; and failed to adequately supervise them during their employment and negligently placed them in such a sensitive position of employment, without adequate or proper training, supervision or control.  Perhaps most notably apparent, defendants failed to properly train their officers with regard to warrant requirements.  The OPD wasted invaluable time seeking out and obtaining a warrant, despite the clear presence of at least two (2) demarcated exceptions to the warrant requirement.  The OPD and MCSO also failed to make a single attempt to contact Rich in a non-threatening manner to dissuade him from killing himself and assuage him of the fears he repeatedly espoused throughout the course of the incident.

114.    Defendants have tolerated and permitted a pattern of negligent conduct with regard to the police response to threatened suicides/hostage negotiations.  In fact, the OPD/MCSO has had at least one (1) other suicide negotiation ending with the individual killing himself within the past ten years, a result of the defendants' inappropriate and negligent actions.  That individual was Richard Steubing on August 2, 1999.  Upon information and belief, the OPD/MCSO has responded to several other incidents involving individuals known to have mental illnesses that have been dealt with inappropriately and have ended in violence due to inadequate training.   Defendants have tolerated and condoned a policy of escalating the dangers inherent in suicide

situations with confrontational police conduct rather than defusing the threats with proper communication.

115.     Despite all of the foregoing events, no officers were disciplined and no investigations were undertaken.  Such lack of initiative by an employer, in a situation with such dire potential consequences, is deplorable.  The potentially dangerous and escalating incidents were allowed to continue unabated.  The OPD and MCSO have utterly failed to act or address the substantiated concerns and fears of the community in how they are dealing with suicide threats.

116.     As a proximate cause of defendants' negligent hiring, training, supervision and retention, Rich and the Briggs family were caused to suffer severe emotional distress, trauma, nervousness, anxiety and have incurred legal fees.

117.     That by reason of the aforementioned, Eunice A. Briggs and Toni A. Briggs are entitled to and hereby make claim for full recovery of damages, including reasonable attorney's fees incurred as a result thereof pursuant to 42 U.S.C. Section 1988.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## VIOLATIONS OF 42 U.S.C. SECTION 1983

118.     Eunice A. Briggs and Toni A. Briggs restate and reallege paragraphs 1-117 as if fully set forth herein.

119.     Defendants violated the provisions of 42 U.S.C. Section 1983 in that, acting under color of law, they deprived Rich of his rights, privileges and/or immunities as provided by, among other provisions, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and its laws, by participating in the 911 response and suicide threat response related to Richard E. Briggs.

120. Rich's civil rights, as guaranteed under the Constitution, statutes, common law, and case law of the United States and of New York State, were willfully violated by all of the above acts of the defendants.

121. As a result of said unlawful actions, in deprivation of Rich's constitutional rights, Rich was caused to suffer severe pain and emotional distress, trauma, nervousness, anxiety, embarrassment, humiliation, and loss of reputation.

122. That by reason of the aforementioned, Eunice A. Briggs and Toni A. Briggs are entitled to and hereby make claim for full recovery of damages, including reasonable attorney's fees incurred as a result thereof pursuant to 42 U.S.C. Section 1988

WHEREFORE, Eunice A. Briggs and Toni A. Briggs demand judgment against defendants as follows:

A. On the First Cause of Action, in favor of Eunice A. Briggs and Toni A. Briggs, in the amount of Five Million Dollars ($5,000,000.00);

B. On the Second Cause of Action, in favor of Eunice A. Briggs and Toni A. Briggs, in the amount of Five Million Dollars ($5,000,000.00);

C. On the Third Cause of Action, in favor of Toni A. Briggs, in the amount of Five Million Dollars ($ 5,000,000.00);

D. On the Fourth Cause of Action, in favor of Eunice A. Briggs and Toni A. Briggs, in the amount of Five Million Dollars ($ 5,000,000.00);

E. On the Fifth Cause of Action, in favor of Eunice A. Briggs and Toni A. Briggs, in the amount of Five Million Dollars ($ 5,000,000.00);

F. On the Sixth Cause of Action, in favor of Toni A. Briggs, in the amount of

Five Million Dollars ($ 5,000,000.00);

G.      On the Seventh Cause of Action, in favor of Eunice A. Briggs and Toni A. Briggs, in the amount of Five Million Dollars ($ 5,000,000.00);

H.      On the Eighth Cause of Action, in favor of Eunice A. Briggs and Toni A. Briggs, in the amount of Five Million Dollars ($5,000,000.00);

I.      In favor of Eunice A. Briggs and Toni A. Briggs in the amount of Five Million Dollars ($5,000,000.00) as punitive damages against the individual members of the Ogden Police Department and Monroe County Sheriff's Office;

J.      That reasonable attorney's fees be awarded to Eunice A. Briggs and Toni A. Briggs pursuant to the Civil Rights Attorneys Fees Act of 1976, and 42 U.S.C. Section 1988;

K.      That Eunice A. Briggs and Toni A. Briggs be awarded the costs and disbursements of this action; and

L.      For such other and further relief as to this Court may seem just and proper.

**PLEASE NOTE:  PLAINTIFFS HEREBY DEMAND TRIAL BY JURY**

DATED:   June 26, 2009

JEFFREY WICKS, PLLC
Attorney for Plaintiffs
36 West Main Street
Suite 101, Executive Building
Rochester, New York 14614
Telephone: (585) 325-6070