UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

EUNICE A. BRIGGS, as Administratrix of
the Estate of Richard E. Briggs, TONI A.
BRIGGS, Co-Administratrix of the Estate of
Richard E. Briggs,

      Plaintiffs,

  v.

THE COUNTY OF MONROE, THE
MONROE COUNTY SHERIFF'S OFFICE,
and SHERIFF PATRICK O'FLYNN,

      Defendants.

_____

**DECISION AND ORDER**

6:09-CV-06147 EAW

## INTRODUCTION

  Plaintiffs Eunice and Toni Briggs (collectively, "Plaintiffs"), co-administratrices of

the estate of the decedent, Richard Briggs ("Decedent"), commenced this action against

Defendants the County of Monroe (the "County"), the Monroe County Sheriff's Office

("MCSO"), and Sheriff Patrick O'Flynn ("Sheriff O'Flynn") (collectively, "Defendants")

for damages arising from Decedent's tragic suicide after a four-hour standoff with law

enforcement.[1]  (Dkt. 1; Dkt. 2).  Plaintiffs bring claims arising under state law as well as

42 U.S.C. § 1983.  (Dkt. 2).  Presently before the Court is Defendants' motion for summary

judgment.  (Dkt. 55).  For the reasons that follow, Defendants' motion is granted with

_____

[1]  Plaintiffs originally named 12 defendants, but nine of those defendants have since
been dismissed from this action.  (*See* Dkt. 25; Dkt. 39; Dkt. 54).

respect to Plaintiffs' § 1983 claims, and the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## BACKGROUND

### I.   Factual Background

The summary judgment evidence shows the following facts, which are undisputed unless otherwise noted.

On March 30, 2008, Decedent tragically killed himself after a standoff with police. (Dkt. 55-1 at ¶ 1; Dkt. 64-2 at ¶ 1).  At the time of his suicide, Decedent was snorting OxyContin daily. (Dkt. 55-1 at ¶ 17; Dkt. 64-2 at ¶ 17).  Decedent was also diagnosed with bipolar disorder, and he suffered from panic attacks.  (Dkt. 55-1 at ¶¶ 12, 14; Dkt. 64-2 at ¶¶ 12, 14).  At the time of his death, Decedent was not taking his medications for his bipolar disorder.  (Dkt. 55-1 at ¶ 13; Dkt. 64-2 at ¶ 13).  Leading up to his suicide, Decedent was depressed and was spiraling out of control.  (Dkt. 55-1 at ¶ 18; Dkt. 64-2 at ¶ 18).  During a domestic dispute between Decedent and Plaintiff Toni Briggs, Decedent's wife, about his drug use, Toni asked Decedent to leave.  (Dkt. 55-1 at ¶¶ 20-23; Dkt. 64-2 at ¶¶ 20-23).  Decedent stated, "If that's the way you feel about it, you'll never have to worry about me again."  (Dkt. 55-1 at ¶ 24; Dkt. 64-2 at ¶ 24).  Decedent grabbed and loaded his shotgun, stating, "You wanted this, this is what you want."  (Dkt. 55-1 at ¶ 25; Dkt. 64-2 at ¶ 25).  Decedent then went into a rage and began loading multiple guns; Toni believed that Decedent was going to shoot himself.  (Dkt. 55-1 at ¶¶ 26-27; Dkt. 64-2 at ¶¶ 26-27).  Decedent told Toni, "Get out of here; you don't want to see this."  (Dkt. 55-1 at ¶ 28; Dkt. 64-2 at ¶ 28).

At approximately 6:40 PM, Toni called 911 because she was afraid that Decedent would kill himself.  (Dkt. 55-1 at ¶¶ 29-30; Dkt. 64-2 at ¶¶ 29-30).  She informed the operator that Decedent was "in the bedroom with a gun—says it's a long gun [and] cocked"; the operator could hear Decedent yelling in the background.  (Dkt. 55-1 at ¶ 31; Dkt. 64-2 at ¶ 31).  At 6:43 PM, the operator heard Decedent "yelling that he's gonna shoot the cops if they come."  (Dkt. 55-1 at ¶ 33; Dkt. 64-2 at ¶ 33).  Decedent pointed a gun at his throat, and then at Toni, saying, "This is it for both of us."  (Dkt. 55-1 at ¶¶ 36-38; Dkt. 64-2 at ¶¶36-38).  Before Toni left the apartment, Decedent was pulling more guns out of the closet and loading them.  (Dkt. 55-1 at ¶¶ 39-40; Dkt. 64-2 at ¶¶ 39-40).

Ogden police officers and a Monroe County sergeant, Sgt. Burns, and sheriff's deputy, Deputy McKenzie, were dispatched to the scene.  (Dkt. 55-1 at ¶¶ 41-44; Dkt. 64-2 at ¶¶ 41-44).  Upon their arrival, Plaintiff Toni Briggs said to law enforcement, "You have to help my husband, he's suicidal, he's got [bipolar], mental issues," and informed them that Decedent had firearms.  (Dkt. 55-1 at ¶¶ 49-50; Dkt. 64-2 at ¶¶ 49-50).  Toni informed the officers that Decedent had a drug problem and was snorting OxyContin.  (Dkt. 55-1 at ¶ 52; Dkt. 64-2 at ¶ 52).  Sgt. Burns requested activation of the MCSO SWAT team and the Hostage Rescue Team ("HRT").  (Dkt. 55-1 at ¶ 55-56; Dkt. 64-2 at ¶ 55-56).  The HRT's mission is to establish communication and negotiate a peaceful resolution of the situation.  (Dkt. 55-1 at ¶ 84; Dkt. 64-2 at ¶ 84).  Sgt. Burns also attempted to call out to Decedent about six times, yelling, "Police Department, we'd like to talk to you," but Decedent did not respond.  (Dkt. 55-1 at ¶ 58; Dkt. 64-2 at ¶ 58).

The officers remained in the apartment building on the inner perimeter until relieved by the SWAT team to ensure that Decedent remained in his apartment. (Dkt. 55-1 at ¶¶ 59-60; Dkt. 64-2 at ¶¶ 59-60). On at least two occasions, the officers could hear Decedent loading firearms through the apartment door and could hear Decedent on the telephone sounding upset. (Dkt. 55-1 at ¶¶ 62-63; Dkt. 64-2 at ¶¶ 62-63). The officers evacuated the building because of public safety concerns, but they maintained the inner perimeter during the evacuation to ensure that Decedent stayed in his apartment. (Dkt. 55-1 at ¶¶ 64-66; Dkt. 64-2 at ¶¶ 64-66). SWAT members then replaced the officers on the inner perimeter of the apartment building, and other law enforcement officers established an outer perimeter. (Dkt. 55-1 at ¶¶ 71-72; Dkt. 64-2 at ¶¶ 71-72). Lt. Fowler, the SWAT Commander on the day of the incident, arrived on the scene at about 7:02 PM. (Dkt. 55-1 at ¶ 77; Dkt. 64-2 at ¶ 77). The SWAT Commander has sole responsibility for tactical command at any incident where SWAT is summoned. (Dkt. 55-1 at ¶ 78; Dkt. 64-2 at ¶ 78). At the scene of an incident, if different units are deployed to the scene, the units report to their own commanders, and each unit commander reports to the incident commander. (Dkt. 55-1 at ¶ 87; Dkt. 64-2 at ¶ 87).

The HRT also arrived, readied the rescue phone, and gave it to the SWAT team to deliver. (Dkt. 55-1 at ¶¶ 96, 107-09; Dkt. 64-2 at ¶¶ 96, 107-09). HRT operating procedures provide that "suspect(s) should be isolated as quickly as possible," which includes "[i]solating or diverting the phone service, including . . . hard line phones, cell phones, cable modems, and cable phone access." (Dkt. 55-1 at ¶ 113; Dkt. 64-2 at ¶ 113). It is common practice to isolate the individual's telephone line so that only law enforcement

can speak with the individual.  (Dkt. 55-1 at ¶ 116; Dkt. 64-2 at ¶ 116).  HRT sought to isolate Decedent's phone line but was unsuccessful.  (Dkt. 55-1 at ¶ 117; Dkt. 64-2 at ¶ 117).  As a result, Decedent's family members who had arrived on the scene continued to speak with Decedent by telephone.  (Dkt. 55-1 at ¶¶ 99, 117; Dkt. 64-2 at ¶¶ 99, 117).

Various family members, including Plaintiff Eunice Briggs (Decedent's mother), Decedent's sister, Lori Briggs, and Decedent's father, arrived at the complex shortly after 7:00 PM.  (Dkt. 55-1 at ¶ 151; Dkt. 64-2 at ¶ 151).  Law enforcement sequestered family members in a vacant apartment, out of the view of Decedent's apartment, and had them remain there or in its immediate vicinity.  (Dkt. 55-1 at ¶ 153; Dkt. 64-2 at ¶ 153).  Two MCSO deputies remained with the family.  (Dkt. 55-1 at ¶ 154; Dkt. 64-2 at ¶ 154).  Law enforcement would not allow Lori Briggs to go to Decedent's apartment.  (Dkt. 55-1 at ¶ 155; Dkt. 64-2 at ¶ 155).  While Lori was sequestered in the vacant apartment, Decedent called her cell phone and asked to speak with Plaintiff Toni Briggs, but law enforcement would not let Toni speak with Decedent.  (Dkt. 55-1 at ¶¶ 156-57; Dkt. 64-2 at ¶¶ 156-57).  Law enforcement warned family members that if they continued to contact Decedent via telephone, Decedent's phone line would be terminated.  (Dkt. 55-1 at ¶ 159; Dkt. 64-2 at ¶ 159).  Later, Lori telephoned Decedent again, and a hostage negotiator "yelled at" her, saying she should not be speaking with him.  (Dkt. 55-1 at ¶ 161; Dkt. 64-2 at ¶ 161).

At about 8:42 PM, law enforcement terminated Decedent's telephone line.  (Dkt. 55-1 at ¶¶ 118-122; Dkt. 64-2 at ¶¶ 118-122).  To communicate with Decedent after his phone line was terminated, HRT and the SWAT team decided to use a rescue phone, which is a 1-foot by 1-foot box with a sign on it that reads "telephone inside, pick it up" and has

a buzzer. (Dkt. 55-1 at ¶¶ 123, 125; Dkt. 64-2 at ¶¶ 123, 125). The SWAT team delivered the rescue phone to Decedent's apartment by lowering it from the roof to Decedent's balcony. (Dkt. 55-1 at ¶ 131; Dkt. 64-2 at ¶ 131). After delivering the rescue phone, law enforcement attempted to contact Decedent, but Decedent never retrieved the rescue phone or spoke with law enforcement. (Dkt. 55-1 at ¶ 136; Dkt. 64-2 at ¶ 136). At 10:50 PM, SWAT members made several announcements, using the public address system, for Decedent to retrieve the phone. (Dkt. 55-1 at ¶ 137; Dkt. 64-2 at ¶ 137). When the announcements were made, Decedent turned up the music in his apartment. (Dkt. 55-1 at ¶ 138; Dkt. 64-2 at ¶ 138).

At 10:53 PM, after attempts to contact Decedent had failed, law enforcement heard a gunshot. (Dkt. 55-1 at ¶ 141; Dkt. 64-2 at ¶ 141). At about 11:01 PM, after further attempts to get Decedent to retrieve the rescue phone, law enforcement deployed CTS gas rounds into Decedent's apartment, and then waited 12 minutes before entering. (Dkt. 55-1 at ¶¶ 143-47; Dkt. 64-2 at ¶¶ 143-47). Upon entry, the SWAT team discovered that Decedent was dead from a self-inflicted gunshot wound. (Dkt. 55-1 at ¶ 148; Dkt. 64-2 at ¶ 148).

Plaintiffs were not in the apartment when Decedent shot himself and did not observe Decedent shoot himself. (Dkt. 55-1 at ¶ 170). Plaintiff Toni Briggs did not witness or hear the rescue phone delivery, Decedent's suicidal gunshot, or the law enforcement actions that followed the gunshot. (Dkt. 55-1 at ¶¶ 168-70; Dkt. 64-2 at ¶¶ 168-70). Defendants were not inside Decedent's apartment when he shot himself; they made no promises to Decedent

on March 30, 2008; they had no conversations with him on that date; and Decedent was not in custody at the time of his death. (Dkt. 55-1 at ¶¶ 171-74; Dkt. 64-2 at ¶¶ 171-74).

The parties' sole factual dispute concerns the activities and involvement of Sheriff O'Flynn on March 30, 2008. Defendants contend that Sheriff O'Flynn was not personally involved in making decisions or taking actions regarding the following alleged acts or omissions: (1) that Defendants should have attempted to begin negotiations with Decedent sooner than they did; (2) that Defendants should not have terminated Decedent's phone line; (3) that Defendants should have allowed family members to communicate with Decedent; (4) that Defendants should not have used the rescue phone but instead should have attempted to communicate with Decedent by another means; (5) that SWAT personnel should not have delivered the rescue phone; (6) that the rescue phone should not have been lowered from the roof to the balcony; and (7) that SWAT team members should not have made the announcement asking Decedent to retrieve the rescue phone. (Dkt. 55-1 at ¶ 176). Plaintiffs dispute Defendants' contention that Sheriff O'Flynn was not personally involved (Dkt. 64-2 at ¶ 176), stating that Sheriff O'Flynn went to the scene of the incident to supervise the actions of his agents and to ensure that the situation was properly handled, and that he stated to Plaintiff Toni Briggs, "[D]on't worry, everything is under control; we're doing everything we can to help [Decedent]" (*id.* at 36).

## II.    **Procedural Background**

On March 30, 2009, Plaintiffs commenced this action against the County, MCSO, and Sheriff O'Flynn in his official and individual capacities, alleging claims pursuant to 42 U.S.C. § 1983 and various state laws arising out of the March 30, 2008, incident. (Dkt. 1).

- 7 -

The operative complaint is Plaintiff's amended complaint, filed on June 26, 2009. (Dkt. 2). Plaintiffs initially named twelve defendants. Seven defendants—the Town of Ogden, the Ogden Police Department, various officials with the Ogden Police Department, and Sergeant Thomas Burns—were dismissed by stipulation. (Dkt. 25; Dkt. 39). The case was then referred to United States Magistrate Judge Marian W. Payson pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) for supervision of pretrial non-dispositive matters. (Dkt. 5). On April 17, 2015, Plaintiffs filed a motion for leave to file an amended complaint. (Dkt. 42). Plaintiffs sought court permission to remove two more defendants—MCSCO Deputies Shannon and Mackenzie—and to add four employees of MCSO as defendants. (*Id.*). On March 29, 2016, Judge Payson issued a Report and Recommendation recommending that the motion for leave to amend be granted in part and denied in part. (Dkt. 48). Judge Payson recommended that Plaintiffs' motion be granted insofar as it sought dismissal of the claims against Shannon and Mackenzie, and denied to the extent that Plaintiffs sought leave to amend to add four new defendants. (*Id.* at 22-23). This Court adopted the Report and Recommendation in its entirety on October 18, 2016. (Dkt. 54).

On November 29, 2016, the three remaining defendants—the County, MCSO, and Sheriff O'Flynn—filed a motion for summary judgment. (Dkt. 55). Plaintiffs responded on April 14, 2017. (Dkt. 64). Defendants filed reply papers on April 25, 2017. (Dkt. 66).

## DISCUSSION

### I.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the court finds that no rational jury could

find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Once the moving

party has met its burden, the opposing party "must do more than simply show that there is

some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come

forward with specific facts showing that there is a genuine issue for trial." *Caldarola v.

Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-

87). "[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.   <u>Section 1983 Claims</u>

The Court begins with Plaintiffs' claims arising under 42 U.S.C. § 1983 because a

district court "may decline to exercise supplemental jurisdiction" over state law claims if

it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C.

§ 1367(c)(3); *see Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.

2006). This Court has original jurisdiction over Plaintiffs' § 1983 claims. 28 U.S.C.

§ 1331 ("The district courts shall have original jurisdiction of all civil actions arising under

the Constitution, laws, or treaties of the United States.").

Section 1983 provides a federal cause of action against persons who, under color of

state authority, caused the deprivation of any rights, privilege, or immunities secured by

- 9 -

the Constitution and laws of the United States. 42 U.S.C. § 1983. Municipalities and other local government entities are considered "persons" under § 1983. *Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Here, Plaintiffs allege that Defendants violated Decedent's Fourth, Fifth, and Fourteenth Amendment rights "by participating in the 911 response and suicide threat response related to [Decedent]." (Dkt. 2 at ¶ 119). Plaintiffs articulate no facts to support a Fourth Amendment violation, as no search or seizure occurred during the incident. Plaintiffs' Fifth and Fourteenth Amendment claims seem to be grounded in a due process claim regarding Decedent's self-inflicted gunshot wound and failure to properly train deputies in suicide prevention.

Defendants contend that Plaintiffs' claims under § 1983 are subject to dismissal because Defendants did not violate Plaintiffs' constitutional rights. (Dkt. 57-1 at 16). According to Defendants, a state's failure to protect an individual from private violence does not amount to a due process violation. (*Id.* at 17). In *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), the Supreme Court observed that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. Accordingly, the Court held that the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. However, the Second Circuit has recognized two exceptions to that general principle. "First, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." *Matican v. City of New*

- 10 -

*York*, 524 F.3d 151, 155 (2d Cir. 2008). "Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Id.* (internal quotation marks omitted). Even if one of those exceptions applies, the plaintiff must also "show that the officers' behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)).

### A.   The Special Relationship Exception Does Not Apply

Defendants argue that the special relationship exception does not apply here. (Dkt. 57-1 at 17). That exception arises "solely from 'the State's affirmative act of restraining the individual's freedom to act on his own behalf [] through incarceration, institutionalization, or other similar restraint of personal liberty." *Matican*, 524 F.3d at 156 (quoting *DeShaney*, 489 U.S. at 200) (alterations in original). Although *DeShaney* suggests that the special relationship exception might support a due process claim against a municipality in certain cases where the victim committed suicide, *see* 489 U.S. at 198 (recognizing duty to "involuntarily committed mental patients . . . to ensure their reasonable safety from themselves"), Defendants contend that Decedent in this case was not in custody.

The Second Circuit has focused on involuntary custody as "the linchpin of any special relationship exception." *Matican*, 524 F.3d at 156 (citing *Lombardi v. Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007) ("Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment.")); *Suffolk Parents of Handicapped Adults*

*v. Wingate*, 101 F.3d 818, 824 (2d Cir. 1996) (holding that the plaintiffs' claim did not fall within *DeShaney* exception because "the plaintiffs here . . . are not involuntarily institutionalized"); *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981) (holding that state is liable under Due Process Clause for abuse suffered by child in foster care, and emphasizing custodial nature of foster care placement). In *Cutlip v. City of Toledo*, 488 F. App'x 107 (6th Cir. 2012), the Sixth Circuit held, based on facts similar to the facts of this case, that the special relationship exception did not apply. *Id.* at 113. The Court explained that the decedent, who had committed suicide after a two-hour standoff with police, was not "incarcerated, institutionalized, or put under a similar restraint at the time that he killed himself—in fact, he had not even been arrested." *Id.* The Court continued:

> There is no evidence that the police put him in a position where he was unable to care for himself. To the contrary, he could have put the shotgun down and left his bedroom at any time, as the police negotiators were imploring him to do, and it is undisputed that he was mentally disturbed before the police arrived at his house, even if his suicidal proclivity only manifested itself at that time. [Decedent] was not put into a helpless position by the police; his actions were purely voluntary.

*Id.*

According to Defendants, because Decedent, like the decedent in *Cutlip*, was never incarcerated, institutionalized, or otherwise restrained within the meaning of *DeShaney*, the special relationship exception does not apply. (Dkt. 57-1 at 18). Plaintiffs disagree, arguing that the restraint imposed on Decedent rose to the level of custody for purposes of the special relationship exception. (Dkt. 64-3 at 18). Plaintiffs distinguish *Cutlip*, arguing that in that case, the responding police officers engaged in negotiations with the decedent

for two hours, whereas here, law enforcement made a show of force outside Decedent's apartment, refused his requests to talk with them, and prevented his family from contacting him. (*Id.*). Furthermore, Plaintiffs argue that in *Cutlip*, the police encouraged the decedent to put down the shotgun and exit the house, 288 F. App'x at 113, but in this case, there is no indication that law enforcement ever encouraged Decedent to leave his apartment or reassured him that he could do so safely (Dkt. 64-3 at 18). Plaintiffs contend that, given Decedent's fear that he would be shot by the police, their refusal to disabuse him of that notion was the functional equivalent of placing him in custody. (*Id.*).

The Court agrees with Plaintiffs that this case is distinguishable from *Cutlip*. Here, it is undisputed that law enforcement sought to prevent Decedent from leaving his apartment. In their statement of undisputed facts, Defendants state that officers "remained in [Decedent's apartment] building to secure the inner perimeter and *ensure Decedent remained in his apartment,*" and that they "maintained the inner perimeter during the evacuation [of the building] because they wanted to *ensure Decedent stayed in his apartment* while they evacuated the building." (Dkt. 55-1 at ¶¶ 60, 66). Officers also maintained an outer perimeter "comprised [of] people surrounding all four sides of the apartment building for containment." (*Id.* at ¶ 73). Furthermore, as Plaintiffs note, law enforcement terminated Decedent's telephone line so that he could no longer communicate with friends and family members. (*Id.* at ¶¶ 111-122). In *Cutlip*, there was no suggestion that law enforcement had taken similar steps to confine the decedent or to similarly restrain his liberty.

This case is more similar to *Christiansen v. City of Tulsa*, 332 F.3d 1270 (10th Cir. 2003), and *Ferreira v. City of E. Providence*, 568 F. Supp. 2d 197 (D.R.I. 2008). In *Christiansen*, another case involving an armed and suicidal individual, the police arrived and set up a perimeter around the apartment building. 332 F.3d at 1275. They also disconnected the decedent's telephone number and assigned a new number to prevent third parties from calling and interrupting negotiations. *Id.* at 1277. Even so, in concluding that the special relationship exception did not apply, the court emphasized two facts about the standoff that are not true of the standoff in this case: In *Christiansen*, the decedent "had access to a telephone line for essentially the entire duration of the standoff," and "rather than restraining [the decedent], the . . . officers affirmatively encouraged [him] to leave his apartment throughout the standoff." *Id.* at 1280. Here, law enforcement terminated Decedent's phone line, rather than merely assigning a new number, and there is evidence that they sought to keep Decedent confined in his apartment, rather than encouraging him to leave.

In *Ferreira*, the decedent was in her car with a gun, threatening to commit suicide. 568 F. Supp. 2d at 203. The police responded to the scene and established a perimeter around the car. *Id.* Although the decedent was able to move her vehicle slowly up the street for several blocks, she eventually came to a stop when her path was blocked by a police van. *Id.* at 204. At that point, police cruisers surrounded the decedent's vehicle. *Id.* Officers attempted to negotiate with her and encouraged her to exit the vehicle, but she ultimately committed suicide. *Id.* at 204-05. Before the district court, the administrator of

the decedent's estate argued that the special relationship exception applied, but the district court disagreed. The court concluded:

> No custodial relationship as envisioned by *DeShaney* was created here. The officers were never in control of [the decedent's] actions, nor was she placed in the situation against her will. . . . [The decedent's] suicidal plans were well under way before the officers arrived on the scene. While Defendants were able to surround [the decedent's] vehicle and prevent her passage, they were not in control of her. . . . While the officers may have limited [the decedent's] ability to travel freely, they did not restrain her. . . . Where officers neither restrained [the decedent] against her will nor limited her freedom to act on her own behalf, no special relationship was created and the officers had no affirmative duty to protect [the decedent] from herself.

*Id.* at 211 (internal quotation marks and citations omitted).

Although this is a closer case than *Cutlip* or *Christiansen*, the Court concludes that there is no issue of material fact with respect to whether Decedent was in custody for purposes of the special relationship exception. Decedent was not in custody. As in *Ferreira*, law enforcement established a perimeter around Decedent but did not restrain him or limit his freedom to act on his own behalf. In fact, officers never came into contact with Decedent, verbally or physically, and it is not clear whether Decedent was even aware of the presence of law enforcement establishing a perimeter around his apartment. Moreover, the Court is not aware of any case in which the special relationship exception applied under circumstances where the individual was not in the physical custody of law enforcement or the government.

### B. The State-Created Danger Exception Does Not Apply

Next, Defendants argue that the state-created danger exception is also inapplicable. That exception applies where the state actor took an affirmative step that "in some way . . .

assisted in creating or increasing the danger to the victim." *Matican*, 524 F.3d at 155. In

applying that principle, the Second Circuit has "sought to tread a fine line between conduct

that is 'passive' (and therefore outside the exception) and that which is 'affirmative' (and

therefore covered by the exception)." *Id.* at 157 (internal quotation marks omitted). The

Second Circuit has found state-created dangers

> where police officers told skinheads that they would not prevent them from
> beating up protestors in a park [*Dwares v. City of New York*, 985 F.2d 94, 99
> (2d Cir. 1993)]; where police officers gave a handgun to a retired officer who
> then shot a fleeing robber, *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir.
> 1998); where a prison guard told inmates that it was "open season" on a
> prisoner, and the inmates beat up the prisoner, *Snider v. Dylag*, 188 F.3d 51,
> 55 (2d Cir. 1999); and where police officials encouraged an off-duty
> colleague to drink excessively, after which he killed three pedestrians in a
> car accident, [*Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005)].

*Id.* By contrast, the Second Circuit has held that the state-created danger exception did not

apply where a police officer failed to intervene to prevent a colleague from shooting

someone during an altercation. *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994).

Here, Defendants argue that the exception does not apply because Defendants did

not create the danger—the self-destructive impulse—through an affirmative act. (Dkt. 57-

1 at 21). According to Defendants, the fact that a state official somehow contributed to a

person's decision to commit suicide does not "transform the victim into the state's agent

of his own destruction." (*Id.* at 22). Plaintiffs respond that Defendants *did* create or

increase the danger to Decedent because they took the affirmative actions of surrounding

Decedent's apartment, cutting off his telephone service, and preventing his family from

communicating with him. (Dkt. 64-3 at 22).

Defendants cite numerous cases in which courts have held that the state-created danger exception did not apply where the victim committed suicide. In *Cutlip*, the court noted that "a situation where the victim committed suicide does not fit neatly into the state-created danger doctrine," and "the primary cases that have found or seriously entertained liability have involved the suicide of minors where school officials or police were in some way responsible." 488 F. App'x at 115. In that case, the court considered whether the state-created danger doctrine applied despite its "reservations about the applicability of [the doctrine] to suicide cases" because there was some question about whether the decedent had intentionally committed suicide, or whether he involuntarily pulled the trigger after the police detonated a flash-bang device. *Id.* at 117. Even so, the court concluded that the state-created danger exception did not apply and that summary judgment in favor of the city was appropriate. *Id.* at 121.

In *Ferreira*, the court concluded, simply, that "[b]ecause [the decedent] ultimately caused her own death," none of the actions on the part of the law enforcement officers constituted affirmative actions sufficient to trigger the exception. 568 F. Supp. 2d at 211. And, in *Christiansen*, the court held that the "'danger' in question—[the decedent's] exposure to a suicide attempt—existed prior to defendants' intervention." 332 F.3d at 1281. The court rejected the plaintiff's argument that the quarantine of the decedent as well as the decision to fire the flexible baton increased the decedent's vulnerability, explaining that "defendants' actions throughout the day demonstrated" that "they intended to remove [the decedent] from the dangerous situation that he himself had created." *Id.*

- 17 -

Plaintiffs cite only *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990), in support of their position that the state-created danger exception applies. (Dkt. 64-3 at 23). There, two victims were killed by the estranged husband of one of the victims after the defendants repeatedly and deliberately "ignored, refused and failed to take seriously" the victim's demands that they enforce the restraining order that she had against her estranged husband. *Freeman*, 911 F.2d at 53. In finding that the plaintiffs had stated a potentially viable claim, the court explained:

> [T]he violence the decedents were subjected to was not solely the result of private action, but . . . it was also the result of an affirmative act by the state actor to interfere with the protective services which would have otherwise been available in the community—with such interference increasing the vulnerability of decedents to the actions of [the estranged husband] and possibly ratifying or condoning such violent actions on his part.

*Id.* at 54. Plaintiffs contend that here, as in *Freeman*, had the defendants not taken the affirmative steps they did, the danger to Decedent would arguably have been less. (Dkt. 64-3 at 23).

The Court concludes that this is not the rare case in which the state-created danger exception might apply to a situation where the victim committed suicide. Here, unlike in *Cutlip*, there is no factual dispute as to the cause of Decedent's death. Decedent took his own life, and Defendants did not bear witness to his death. The danger to Decedent existed before law enforcement arrived on the scene, and, as in *Christiansen*, Defendants' actions demonstrated their intent to protect Decedent from the self-created danger.

**C.   Even if an Exception Applies, Defendants' Actions do not "Shock the Conscience"**

Finally, to establish a constitutional violation, even if the claims fell within either the special relationship or state-created danger exception, Plaintiffs would have to show that Defendants' behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Matican*, 524 F.3d at 155; *see also Lewis*, 523 U.S. at 846. The Supreme Court has not clearly defined the parameters of behavior that can be said to "shock the conscience," but it has noted that negligently inflicted harm is "categorically beneath the threshold of constitutional due process," and the intentional infliction of injury is the conduct "most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.   In between those extremes is conduct exhibiting "deliberate indifference" to harm, which can support a due process claim depending on the specific circumstances. *Id.* at 850. "Deliberate indifference that shocks in one environment may not be patently egregious in another," and "due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Id.*

In *Lewis*, the Supreme Court held that a police officer does not violate due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender. *Id.* at 836. The Court explained that "the police on an occasion calling for fast action have obligations that tend to tug against each other. . . . [T]heir decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 853 (internal quotation marks omitted).   By contrast, in *Pena*, a case where police officials encouraged an off-duty

colleague to drink excessively, after which he killed three pedestrians in a car accident, the Second Circuit concluded that the defendants' behavior was conscience shocking. 432 F.3d at 114. The defendants "had ample opportunity, not only during the day in question, but also during the days, weeks and months that preceded it, in which to decide what to do and say in response to the alleged practice of drinking and driving by off-duty officers." *Id.* This case falls somewhere in between *Lewis* and *Pena.* The standoff here lasted much longer than the course of events in *Lewis,* which took place over a mere seventy-five seconds. *Lewis,* 523 U.S. at 837. But it also cannot be said that law enforcement had ample opportunity to decide what to do in a situation exactly like this one. However, as in *Lewis,* Defendants had conflicting obligations—an obligation to prevent Decedent from committing suicide, and an obligation to protect the community.

In *Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992), the Fifth Circuit delved into the nuances of what sort of conduct by law enforcement can be considered conscience-shocking. In that case, the sheriff led police efforts to free a hostage, who was ultimately killed by her abductor. *Id.* at 302. The plaintiff argued that many of the sheriff's actions and decisions were wrongful, in particular, his refusal of assistance from local police and the hostage negotiation team, as well as his use of incompetent hostage negotiators rather than trained professionals. *Id.* at 303. The court was not persuaded that the sheriff "increased the victim's vulnerability to danger in the sense envisioned by the Court in *DeShaney.*" *Id.* at 309. The court distinguished the circumstances of that case from *Wood v. Ostrander,* 879 F.2d 583, 590 (9th Cir. 1989), in which a trooper arrested a driver and abandoned the female passenger in a high crime area in the middle of the night, creating

the danger that she would be assaulted, and *White v. Rochford*, 592 F.2d 381, 382 (7th Cir. 1979), in which the police arrested a driver and left children unattended on a highway. *Carpenter*, 980 F.2d at 309. The court explained that, in those cases, "officials failed to take any action to alleviate the danger which they created or aggravated," whereas the sheriff in *Carpenter* "did not worsen [the victim's] position and abandon her to allow events to run their course." *Id.*

Defendants argue that Plaintiffs cannot point to any conduct on the part of Defendants that "shocks the conscience." (Dkt. 57-1 at 25). They contend that in similar standoff cases, courts have found that the alleged acts were not conscience-shocking. (*Id.*); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 515 (6th Cir. 2002) ("Although, in hindsight, we may agree that the decisions made were ill-advised, and may also agree that [the police chief] was negligent in failing to better inform himself before making the decision, this would not lead to the conclusion that he callously disregarded the risk of injury. . . ."); *Christiansen*, 332 F.3d at 1282 ("[D]efendant's conduct did not demonstrate a degree of outrageousness that is truly conscience shocking." (internal quotation marks and alterations omitted)).

Plaintiffs respond that Defendants' conduct in cutting off all contact for hours between the mentally ill, armed, and suicidal Decedent and the outside world falls squarely within the definition of deliberate indifference that shocks the conscience. (Dkt. 64-3 at 25). Plaintiffs seem to stress that Decedent repeatedly stated his desire to communicate with police. (*Id.*). However, Plaintiffs also acknowledge that law enforcement attempted to make contact with Decedent through a rescue phone (Dkt. 55-1 at ¶ 136; Dkt. 64-2 at

¶ 136), as well as by calling out to Decedent six times (Dkt. 55-1 at ¶ 58; Dkt. 64-2 at ¶ 58), but Decedent did not engage.

Although the Court has already concluded that neither the special relationship nor the state-created danger exception applies, the Court also concludes that, even if one of those exceptions did apply, Defendants' conduct does not shock the conscience. There is no suggestion that Defendants intended to cause harm to Plaintiffs or Decedent. Although Plaintiffs contend that Defendants took the wrong approach to diffusing the situation, they do not argue that Defendants acted maliciously. *Cf. Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (actions of gym teacher in assaulting student shocked the conscience because conduct was "maliciously and sadistically employed in the absence of a discernible government interest and . . . of a kind likely to produce substantial injury"). As in *Carpenter*, Defendants did not worsen Decedent's position. They responded to reports of a suicidal individual and made efforts to save Decedent while protecting the safety of bystanders. Defendants' conduct does not shock the conscience. Defendants' motion for summary judgment is therefore granted with respect to Plaintiffs' § 1983 claims.[2]

---

[2]    Defendants also contend that Plaintiffs' *Monell* claims fail because there is no underlying Constitutional violation and because Plaintiffs adduced no policy or custom. (Dkt. 57-1 at 28). The Court agrees. A *Monell* claim fails if there is no underlying constitutional violation. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) (holding local government may be liable under § 1983 only if injury is inflicted during execution of government's policy or custom).

## III.   New York State Law Claims

Plaintiffs also assert claims arising under New York state law for wrongful death, negligence, loss of consortium (Plaintiff Toni Briggs only), intentional infliction of emotional distress, negligent infliction of emotional distress as to Decedent, negligent infliction of emotional distress as to Toni Briggs, and negligent training, retention, and supervision.   (Dkt. 2 at ¶¶ 68-122).   Because this Court has determined that summary judgment is appropriate with respect to Plaintiffs' claims arising under § 1983, the Court must now determine whether it will exercise supplemental jurisdiction over Plaintiffs' state law claims.   The Court declines to exercise supplemental jurisdiction.

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."   A district court may decline to exercise supplemental jurisdiction over a claim under a number of circumstances, including where "the district court has dismissed all claims over which it has original jurisdiction[.]"   *Id.* § 1367(c)(3).   "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."   *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) (internal citations and quotation marks omitted).

The concept of supplemental jurisdiction has its origins in the doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966).   There, the Court explained that the justification for the

discretionary exercise of pendent jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims." *Id.* at 726. After *Gibbs*, the Supreme Court further held that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine— judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349-50, n.7 (1988); *see also Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003).

In *O'Brien v. Yugartis*, 54 F. Supp. 3d 186 (N.D.N.Y. 2014), the court considered whether to exercise supplemental jurisdiction under circumstances similar to those of this case. The court explained:

> In the instant case, discovery has been completed and the parties' positions on summary judgment have been thoroughly briefed. This Court has not, however, previously ruled on any motion affecting the merits, and the state law issues differ substantially from the two federal issues decided herein. Therefore, the benefit of the pretrial proceedings already conducted will not be lost if the case is remanded, and the factors of judicial economy and convenience do not weigh significantly for or against remand. Refusal to exercise supplemental jurisdiction will not result in unfairness, particularly because the action was commenced in state court and plaintiff will not be required to bring a new action. Most importantly, the factor of comity favors remand. The remaining claims concern quintessentially state-law matters. . . . As the Second Circuit recently noted, "concerns of comity and of federalism . . . encourage remanding to the state courts cases in which state court adjudication can properly claim primacy of interest."

*Id.* at 194 (quoting *Sunnen v. New York State Dept. of Health*, 544 F. App'x 15, 17 (2d Cir. 2013)). Here, as in *O'Brien*, discovery has been completed and the parties have briefed

the state law claims, but the Court has not ruled on a dispositive motion, and the state law issues are significantly different from the federal § 1983 claims. Although the case did not arise in state court, the Court concludes that exercising supplement jurisdiction over the state law claims would be inappropriate. Plaintiffs' state law claims are numerous— Plaintiffs raise claims under state law for wrongful death, negligence, loss of consortium, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent training, retention, and supervision. (Dkt. 2 at ¶¶ 68-122). Those claims are not so straightforward as to weigh in favor of exercising jurisdiction, in the interest of judicial economy. The Court concludes that the balance of factors weighs against exercising supplemental jurisdiction over Plaintiffs' state law claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 55) is granted in part and denied in part. The motion is granted with respect to Plaintiffs' claims under § 1983, and those claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiffs' claims arising under New York state law. Accordingly, those claims are also dismissed without prejudice. The Clerk of Court is directed to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

DATED:      March 16, 2018
            Rochester, New York